UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


JEFFERY CHAMPAGNE                          CIVIL ACTION


VERSUS                                     NO: 09-6723


B.S. OCEAN MARITIME PTE                    SECTION: "J" (3)
LTD., ET AL.


**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**


     This matter came on for bench trial on the merits on
August 22, 2011.  Upon consideration of all of the evidence and
argument of counsel, and pursuant to Federal Rule of Civil
Procedure Rule 52(a), the Court issues the following findings of
fact and conclusions of law:

1.

     Plaintiff Jeffery Champagne  was employed by Ports America
Louisiana, Inc. as a cargo clerk on the Mississippi River. On the
evening of November 14, 2008, a Ports America longshore gang was
working aboard the M/V AMARANTH BRIDGE, a bulk cargo vessel owned

and operated by defendant B.S. Ocean Maritime PTE Ltd.  Mr.
Champagne was aboard the vessel as a cargo tally clerk
responsible for the unloading of a cargo of steel coils from the
No. 3 hold.   The stevedores had attempted to unload the steel
coils earlier that morning, but their work was delayed due to
rain.  The stevedores boarded the vessel at approximately 6:00
p.m.  Mr. Champagne claims that he climbed out of the No. 3 hold
at approximately 7:15 p.m., and while walking along the port side
deck between the No. 3 hold and the outboard rail, he slipped in
hydraulic oil on the deck.  There were no witnesses to
plaintiff's actual fall.   However, Mr. Champagne did report the
accident almost immediately to his supervisor and an accident
report was completed the same night.  The Ports America
superintendent, Larry Smith, was notified; boarded the ship
within minutes; and took photographs depicting oil on the deck
near the No. 3 hold, which appeared to be coming from a hydraulic
line which served to operate the hatch covers.  Mr. Smith also
took photographs depicting oil on Mr. Champagne's shoes and
clothes.  In addition, the vessel's deck log confirms that at
about 7:00 p.m. the vessel's crew found oil escaping from the No.
3 hatch cover hose.  Mr. Smith testified that by the time he
arrived on the vessel to take the photographs, the vessel's crew
was already in the process of cleaning up the oil spill near the

2

No. 3 hold.  Defendants believe plaintiff staged his accident.
However, the preponderance of the evidence convinces the Court
that the accident occurred as alleged.  As shown in the ship's
deck log, the ship's crew had actual knowledge of the oil leak at
least 15 minutes prior to plaintiff's accident, but failed to
undertake any precautions to prevent an accident.  The Court
finds that the vessel owner was negligent and that such
negligence was a proximate cause of plaintiff's injury to his
back.  Because this incident occurred at night, and the
photographs show that the deck area was dimly lit, the Court
finds that plaintiff was not contributorily negligent.

                                2.

     Among the "Scindia" duties owed by a vessel owner to
longshoremen is the "duty to intervene," which is the "duty to
act where the danger to longshoremen arises from the
malfunctioning of the ship's gear being used in the cargo
operations."  Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451
U.S. 156, 175 (1981). The Court finds that because of the leakage
of hydraulic oil, the vessel owner had a duty to intervene in the
stevedoring operations to prevent harm to the stevedores and
unloading clerks, and that the vessel owner breached this duty,
causing Mr. Champagne's injury.  The vessel owner was aware that
the conditions on the ship posed a danger and that the stevedores

                                3

would continue to work in the face of the danger.  While the leakage was on the port side of the vessel, the stevedoring crew was down in the hold, and the "flag man" was on the starboard side.  Thus, the stevedoring crew unloading the No. 3 hatch was not in a position to notice the danger, and it was negligent for the vessel owner to rely on the stevedores' judgment in continuing to unload the vessel.

3.

Plaintiff claims that the shipboard accident resulted in a serious back injury which prevents him from working.  He had a previous back injury from a car accident in 2005.  He says he did not miss any work following that accident.  However, he had an MRI which showed degenerative changes and a protruding disc at one or two levels, and Dr. Kenneth Vogel recommended surgery, which was never performed.  Mr. Champagne settled his car accident claim, but continued seeing "pain management" doctors, and taking hydrocodone or suboxone (and perhaps methadone).  He claims that prior to the shipboard accident, he had completely recovered from the car accident but had gotten hooked on the pain medications, so that is why he was still taking suboxone.  He had his medications refilled only eight days before his shipboard slip and fall on November 14, 2008.  The Court finds that plaintiff was still symptomatic from his 2005 injury, and was

4

still seeking medical treatment and medications for his back injury. However, there is no evidence that plaintiff was under the influence of any drugs, legal or illegal, at the time of his 2008 accident and injury.

4.

Plaintiff has been examined or treated by a number of doctors since his 2008 accident. These medical records are in evidence. Two physicians who testified at trial were Dr. Bradley Bartholomew, a neurosurgeon to whom he was referred by his attorney, and Dr. Kenneth Adatto, an orthopedic surgeon who performed an IME for the defendant. Both doctors reviewed the 2008 MRI and compared it to the previous 2005 MRI report. Both read the 2008 MRI as showing some progression of findings. However, most of the findings on MRI were degenerative changes that clearly predate the 2008 accident. Dr. Bartholomew testified there was a 4 mm protrusion or rupture at the L5-S1 level. Dr. Adatto testified there were new findings at L4-5. Both opined that the 2008 accident aggravated plaintiff's preexisting condition.

5.

At Dr. Bartholomew's direction, a lumbar discogram was performed. The test confirmed an abnormal disc at L5-S1, but did not reproduce Mr. Champagne's pain. Dr. Bartholomew considered

5

the test invalid or non-diagnostic.  Dr. Bartholomew also
performed bilateral facet blocks, which plaintiff claims reduced
his pain level by about 25%.  Based on the clinical findings and
the MRI, Dr. Bartholomew recommended possible surgical
intervention.  Dr. Adatto said surgery would not be helpful since
the discogram did not reproduce plaintiff's pain.  Plaintiff has
not had any surgery and indicated he did not intend to undergo
surgery.  The Court finds more likely than not that Mr. Champagne
will not have surgery.

6.

     The Court finds plaintiff had a mild to moderate aggravation
of his preexisting condition.  He should be capable of returning
to full time employment.  His previous employment was considered
light work.  He performed the functions of a cargo clerk,
sometimes on the dock and sometimes aboard a ship.  He did have
to occasionally stoop or bend, and climb a ladder to get down
into the ship's hold to tally cargo.  Previously, he had managed
an off-track betting parlor.  Mr. Champagne has not attempted to
work since November 14, 2008, except for one day following the
accident.  The accident occurred nearly three years ago.  He
should have been able to return to work before now.  The Court
finds that plaintiff has failed to mitigate his damages, and that
with reasonable effort he would have returned to work not later

than one year post accident.

                                    7.

    Plaintiff seeks to recover approximately $25,000 for past
medical expenses.  The majority of these charges consist of
pharmacy bills.  The Court has reviewed these pharmacy bills, and
finds that the majority of these charges are not related to the
accident of November 2008, but rather pertain to plaintiff's
preexisting lumbar condition or other unrelated medical
conditions.  Upon review of the evidence, the Court finds that
plaintiff is entitled to recover unpaid medical expenses in the
amount of $7,227.   In addition, plaintiff is awarded lost wages
in the amount of $37,471, which will fairly compensate plaintiff
for 12 months of past after-tax/after business expense wage
loss.[1]  Finally, the Court finds that the sum of $50,000 will
adequately compensate plaintiff for his general damages,
including pain, suffering and any physical disability.

                                    8.

    Judgment will be entered in favor of plaintiff together with
interest from the date of injury plus court costs.

───────────────

    [1] This is derived by dividing Dr. Randy Rice's after-tax past wage loss
of $103,046 through date of trial by 33 months since the accident, and then
multiplying the monthly figure by 12 months.

                                    7

New Orleans, Louisiana this the 26th day of August, 2011.

CARL J. BARBIER

UNITED STATES DISTRICT JUDGE